IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY H. FLORES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 7419 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| WALGREEN CO., DETECTIVE RICARDO | ) | |
| GALARZA, OFFICER NOLAN S. | ) | |
| MCCLEARY, OFFICER S. MANTZKE, | ) | |
| OFFICER T. KEARBEY, AND THE CITY OF | ) | |
| AURORA | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Kimberly Flores ("Flores") filed suit against Walgreen Co. ("Walgreens"), Detective

Ricardo Galarza ("Galarza"), Officer Nolan S. McCleary ("McCleary"), Officer S. Mantzke

("Mantzke"), Officer T. Kearbey ("Kearbey"), and the City of Aurora ("Aurora") alleging that she

was unlawfully seized, falsely arrested, illegally imprisoned, and maliciously prosecuted in violation

of federal and Illinois law. Specifically, Count I of Flores' Amended Complaint alleges, pursuant

to 42 U.S.C. § 1983, that Galarza, McCleary, Mantzke, and Kearbey conspired to falsely arrest her

in violation of the Fourth and Fourteenth Amendments.[1] Count II alleges a § 1983 *Monell* claim

against Aurora for its inadequate police training and supervision that caused Flores' constitutional

injuries. Count III alleges Galarza, McCleary, Mantzke, Kearbey, and Aurora maliciously prosecuted

Flores after arresting her without legal justification or probable cause. Count IV alleges Walgreens,

---

[1] Count I also implies the same defendants maliciously prosecuted Flores, but because this claim is explicitly
stated in Count III, it will be addressed there.

through the action of its employees, wrongfully and maliciously identified Flores in a photo-lineup, leading to Flores' indictment and trial, in violation of Illinois state malicious prosecution laws. Count V alleges that Galarza, McCleary, Mantzke, Kearbey, and Aurora falsely arrested and illegally imprisoned Flores in violation of Illinois state law.

Walgreens' Motion to Dismiss with prejudice was granted[2], and Flores voluntarily dismissed Officers McCleary and Mantzke. The remaining defendants, Galarza, Kearbey, and Aurora (collectively "Defendants") now move for summary judgment. For the reasons stated below, the Court grants Defendants' Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED FACTS[3]

Galarza has been employed by the Aurora's Police Department ("APD") since January 21, 2002 and was assigned to APD's Investigative Unit in January 2007. (P 56.1 Resp. ¶ 2; D 56.1 Resp. ¶ 1.) He did not receive a training partner or any specialized training from APD after becoming a detective other than attendance at an interrogation class. (D 56.1 Resp. ¶ 2.) Kearbey has been employed by APD for twenty-one years and has been the Sergeant in charge of the Investigations Division since 2007. (P 56.1 Resp. ¶ 5.)

**I.  January 12, 2007**

On January 12, 2007 at approximately 11:24 a.m., Deanna Durbin ("Durbin") was working as a cashier at a Walgreens store located at 1221 N. Lake Street, Aurora Illinois. (P 56.1 Resp. ¶ 8.)

---

[2] The dismissal of Walgreens also dismissed Count IV of Flores' Amended Complaint.

[3] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "D 56.1 Ex. __."; citations to Flores' Answers to Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "P 56.1 Resp. ¶ __."; citations to Flores' Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "P 56.1 Add. Facts Ex. __."; citations to Defendants' Response to Plaintiff's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "D 56.1 Resp. ¶ __."

A female customer approached Durbin and attempted to purchase $200.00 worth of Virgin Mobile phone cards. (P 56.1 Resp. ¶ 8.) Durbin tried to complete the sale but the satellite was down so she had to call executive assistant manager Kimberly Naumann ("Naumann") to void the purchase on the register. (P 56.1 Resp. ¶ 9.) Naumann voided the phone card purchase and the customer instead purchased a couple of cartons of Newport cigarettes totaling $92.74. (P 56.1 Resp. ¶ 12.) Durbin rang up the items and the customer paid for her purchase using a MasterCard credit card, swiping it herself on the small machine in front of the register. (P 56.1 Resp. ¶ 13.) The transaction was approved and Durbin asked the customer to sign the receipt. (P 56.1 Resp. ¶ 14.) The customer signed, and then pursuant to store policy, Durbin asked for identification to verify the signature. (P 56.1 Resp. ¶ 16.)

At this time, Durbin noticed that the name on the receipt was a man's name. (P 56.1 Resp. ¶ 16.) The female customer refused to show identification, angrily stating she did not have time to do that, grabbed her items and ran out of the store. (P 56.1 Resp. ¶ 17.) Durbin was never able to verify the signature or see the credit card, although she had the receipt that the customer signed. (P 56.1 Resp. ¶ 17.) The name on the receipt was Charles M. Larson ("Larson"), but the customer had signed the receipt "I Forge." (P 56.1 Resp. ¶ 19.) Durbin immediately informed Naumann, who looked at the receipt and went outside to see if she could get a license plate or any other information about the customer, but she was unsuccessful. (P 56.1 Resp. ¶ 21.) An hour and fifteen minutes later, Durbin met with store manager Mike Levine ("Levine"), and explained what had happened. (P 56.1 Resp. ¶ 22.) Flores claims she was not at this Walgreens store at any point on January 12, 2007. (P 56.1 Resp. ¶ 24.)

## II. January 17, 2007

Five days later, on January 17, 2007, Flores entered the Walgreens on 1221 N. Lake Street. (P 56.1 Resp. ¶ 25.) Durbin again was working as a cashier and recognized Flores by her hair color and facial features as the customer who used Larson's credit card on January 12, 2007 and fled the store. (P 56.1 Resp. ¶ 25.) Durbin called Levine and Naumann, and they told Durbin to handle the situation discreetly and notify her if Flores attempted to pay with a credit card. (P 56.1 Resp. ¶ 26.)

Flores approached Durbin with her items, totaling less than $20.00, and attempted to pay with a credit card. (P 56.1 Resp. ¶ 28.) Durbin informed Flores that there was a problem with her credit card. (P 56.1 Resp. ¶ 32.) Flores then offered to pay with a personal check. (P 56.1 Resp. ¶ 32.) Walgreens' policy is to look at a state ID or driver's license when a customer pays by check, so Naumann, who had arrived at the cash register, took and processed Flores' check. (P 56.1 Resp. ¶ 33.) Naumann wrote Flores' driver's license number on top of the check and, according to Flores, Naumann took the check and Flores' driver's license to the back room and did not return for ten minutes. (P 56.1 Resp. ¶ 34.) Naumann said everything was fine, handed Flores her driver's license, and Flores, irritated, collected her items and left the store. (P 56.1 Resp. ¶ 34.) Naumann went outside and wrote down Flores' license plate number and then returned and spoke to Durbin and Levine. (P 56.1 Resp. ¶ 35.) Durbin confirmed that she was sure Flores and the customer who paid with Larson's credit card on January 12 were the same person. (P 56.1 Resp. ¶ 37.) Naumann agreed. (P 56.1 Resp. ¶ 37.)

## III. Naumann Contacts APD

Shortly after Flores' visit to the store on January 17, 2007, Naumann called APD. (P 56.1 Resp. ¶ 38.) McCleary was dispatched to Walgreens where he spoke with Naumann and Levine

about both transactions on January 12 and January 17. (P 56.1 Resp. ¶ 38.) Levine described the customer on January 12 as a white female with wavy dirty blonde hair and wearing pink sweat pants. (P 56.1 Resp. ¶ 39.) Naumann described the customer as Caucasian with medium length dark blonde hair and wearing a sweatshirt. (P 56.1 Resp. ¶ 41.) Levine said he would check to see if he had any security footage of the transactions, but did not provide any to McCleary. (P 56.1 Resp. ¶ 43.) McCleary confirmed the license plate was registered to Flores and wrote up a field report, which was reviewed by Mantzke. (P 56.1 Resp. ¶ 44.)

## IV. Galarza Assigned to Investigate

Approximately three days later, around January 20, 2007, Kearbey assigned Galarza to investigate the fraudulent use of a credit card belonging to Larson. (P 56.1 Resp. ¶ 45.) Galarza contacted MasterCard and was informed that Larson's credit card was reported stolen on January 13, 2007. (P 56.1 Resp. ¶ 47.) Larson told Galarza that he did not know Flores nor did he allow her permission to use his credit card. (P 56.1 Resp. ¶ 47.) No video surveillance footage was obtained. (P 56.1 Resp. ¶ 49.) Galarza also investigated another January 12, 2007 incident of fraudulent use of Larson's credit card that occurred at a Walgreens store located at 1207 N. Randall Road, Aurora, Illinois. (D 56.1 Resp. ¶¶ 4, 12.) The manager of the Randall Road Walgreens, Anthony Loyd ("Loyd") stated that he was sure the fraudulent transaction was captured on video tape. (D 56.1 Resp. ¶ 12.) In January 2007 APD had a policy in place that instructed officers to utilize all available evidence when conducting any investigation. (D 56.1 Resp. ¶ 10.) Galarza was trained to secure video tape when it was available. (D 56.1 Resp. ¶ 10.) However, the security camera footage from the Randall Road Walgreens and the N. Lake Street Walgreens were never obtained by Galarza or

provided by Walgreens[4]  (D 56.1 Resp. ¶ 12.)

## V.  The Photo-Lineup on January 24, 2007

Galarza and another Detective, Sally Trujillo ("Trujillo"), went to the Walgreens store on 1221 N. Lake Street to interview Durbin and Naumann.  (P 56.1 Resp. ¶ 50.)  Galarza presented Durbin and Naumann with advisory forms and a photo-lineup.  (P 56.1 Resp. ¶ 50.)  Durbin immediately identified and confirmed photograph # 2 as the individual involved in both incidents on January 12 and 17, 2007.  (P 56.1 Resp. ¶ 53.)  Naumann positively identified photograph # 2 as the individual involved in the January 17 transaction, but was less certain about the individual involved in the January 12 transaction.[5]  (P 56.1 Resp. ¶ 52.)  Naumann said she did not get a good look at the customer but that Durbin was sure it was Flores.  (P 56.1 Resp. ¶ 57.)  The individual in photograph # 2 was Flores.  (P 56.1 Resp. ¶ 56.)

On January 22, 2007, Galarza had gone to the Randall Road Walgreens and spoken to its manager, Loyd.  Galarza presented photo-lineups to two employees at the Randall Road Walgreens, Ashley Dazzo ("Dazzo") and Christina Magana ("Magana").  Neither Dazzo nor Magana could identify the offender from January 12, 2007 in the photo-lineups that contained pictures of Flores. (D 56.1 Resp. ¶ 7.)

---

[4] A dispute exists between the parties as to whether the failure to obtain security camera footage is the fault of Galarza, Walgreens managers, or technical problems with the cameras themselves.  *See* Naumann Dep. 54 (during time frame of October 2006 to October 2007, an incident occurred at 1221 N. Lake Street Walgreens where police requested security camera footage and store managers discovered that the cameras were not functioning properly and were not recording).  Regardless, this dispute is not material because there is evidence that Galarza requested the footage.

[5] A dispute exists as to what Naumann conveyed to Galarza after viewing the photo-lineup regarding the January 12, 2007 incident.  (D 56.1 Resp. ¶ 8.)  Galarza claims Naumann positively identified Flores as the customer on January 12 and January 17; Naumann, however, claims she only identified Flores as the customer on January 17th but was not certain of the January 12th customer's identity.  (D 56.1 Resp. ¶ 8.)  Regardless, this dispute is not material because Durbin positively identified Flores as the customer on both January 12 and January 17.

## VI. First Interview of Flores

Flores returned to her home on February 5, 2007 and found a card left by Galarza who had written a note informing her that he wanted to speak with her at APD about a credit card investigation. (P 56.1 Resp. ¶ 60.) Flores went to APD later that day and met with Galarza alone. Galarza read her her Miranda rights and then informed her that the evidence in a fraudulent credit card case he was investigating implicated her as a suspect. (P 56.1 Resp. ¶ 61.) After Galarza described the events of January 12, 2007, Flores denied being in a Walgreens on January 12, 2007 and asked to take a lie detector test. (P 56.1 Resp. ¶ 63.) Flores then confronted Galarza with her check from the January 17, 2007 transaction, including the area where a Walgreen's employee had made markings after checking her driver's license. (P 56.1 Resp. ¶ 63.) Flores maintained that she was not at the Walgreen's on that day. (P 56.1 Resp. ¶ 63.) Galarza did not administer or arrange for a lie detector test. (P 56.1 Resp. ¶¶ 62, 64.)

## VII. Second Interview of Flores

Flores returned to APD on February 14, 2007 at 11:25 a.m. and met again with Galarza. (P 56.1 Resp. ¶ 65.) This time, Galarza was accompanied by Kearbey. (P 56.1 Resp. ¶ 65.) Galarza read Flores her Miranda rights and again told her, based on Durbin's and Naumann's identifications, that the investigation revealed Flores to be the customer fraudulently using Larson's credit card on January 12, 2007. (P 56.1 Resp. ¶ 68.) Flores again denied being the customer, but was nervous and could not explain why two independent witnesses would have identified her. (P 56.1 Resp. ¶ 69.) Flores told Galarza to get the Walgreens surveillance tapes. (P 56.1 Resp. ¶ 69; D 56.1 Resp. ¶ 9.) Galarza told Flores he would submit his information over to Kane County State's Attorney's Office ("KCSAO").

## VIII. KCSAO Approves Charges

That same day, Galarza spoke to Assistant State's Attorney Amy Engerman ("Engerman") of KCSAO. (P 56.1 Resp. ¶ 71.) He told Engerman that while Flores denied the charges, both Durbin and Naumann had positively identified Flores as the offender. (P 56.1 Resp. ¶ 72.) Galarza does not recall if he told Engerman that Flores used a personal check to pay for her January 17, 2007 purchases, or that she produced her driver's license to Durbin before paying by check. (D 56.1 Resp. ¶ 16.) Galarza also did not mention to Engerman that employees at the Randall Road Walgreens, who were also the victims of fraudulent use of Larson's credit card on January 12, 2007, could not identify Flores in a photo-lineup.[6] (D 56.1 Resp. ¶ 15.) After hearing Galarza's synopsis, Engerman approved a charge of Unlawful Use of a Credit Card against Flores for the January 12, 2007 incident at the N. Lake Road Walgreens. (P 56.1 Resp. ¶ 73.) The next day, on February 15, 2007, a warrant was issued for Flores' arrest, and Flores voluntarily turned herself in on April 21, 2007. (P 56.1 Resp. ¶ 73.) Galarza was the sole witness who testified before the Grand Jury on August 7, 2007. (D 56.1 Resp. ¶ 21.) Galarza erroneously testified that, according to witnesses, on January 17, 2007 Flores ran out of the Walgreens before her check could be processed. (D 56.1 Resp. ¶ 21.)

## IX. Criminal Trial

Flores posted bond and went to trial on June 16, 2008. (P 56.1 Resp. ¶ 75.) A jury acquitted her on June 17, 2008. (D 56.1 Resp. ¶ 21.) Meanwhile, Galarza received an annual APD evaluation by his supervisor Kearbey on November 20, 2007. (D 56.1 Resp. ¶ 24.) The report stated that Galarza was "more interested in working overtime on the street then [sic] doing what is required in

---

[6] *Cf.* Kearbey Dep. 30 (if a witness says "[n]o, that's definitely not the person," then that is something the officer should tell the State's Attorney).

investigations." (D 56.1 Resp. ¶ 24.) Kearbey had previously sent an interoffice memorandum to Lieutenant Olsen ("Olsen") regarding Galarza's work performance that stated "Galarza's work does not meet the standards required of a new detective." (D 56.1 Resp. ¶ 25.) By January 2008, Galarza was reassigned to the patrol division. (D 56.1 Resp. ¶ 25.) Flores filed this suit on December 30, 2008.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I.  Count I

Count I of Flores' First Amended Complaint alleges several violations under 42 U.S.C. § 1983.  Flores claims that Galarza and Kearbey falsely arrested her and used excessive force in doing so, violating her rights under the Fourth and Fourteenth Amendments. In addition, Flores alleges that the APD officers coordinated their actions and engaged in a joint venture effectively conspiring to deprive her of her liberty.  (Pl. Compl. ¶ 37.)  Actions under § 1983 provide redress for constitutional violations committed under color of state law.  To recover under § 1983, plaintiffs must show that: (1) they were deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was visited upon them by a person or persons under color of state law.  *See McKinney v. Duplain*, 463 F.3d 679, 683 (7th Cir. 2006).  Section 1983 claims against individuals require personal involvement in the constitutional deprivation.  *See Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003); *Kelly v. Mun. Courts of Marion County*, 97 F.3d 902, 909 (7th Cir. 1996) ("Individual liberty under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue.").  Even if a plaintiff states a valid claim under § 1983, an individual acting under color of state law may assert qualified immunity.  "The doctrine of qualified immunity shields government officials against suits arising out of their exercise of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *McKinney,* 463 F.3d at 683-84 (internal quotations omitted).  Therefore, a two-part test for § 1983 claims and qualified immunity exists: a court must determine whether the defendant's conduct violated one of the plaintiff's constitutional rights and whether the defendant's conduct violated clearly established rights of which a reasonable person would have known.  *See id.* at 684

(citations omitted). The Court may address either part of the test before addressing the other. *See Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

A. False Arrest

*i. Valid Warrant*

Flores first claims that APD Officers Galarza and Kearbey falsely arrested and unreasonably seized her in violation of the Fourth Amendment. To prevail on her claim of false arrest, she must show that she was unlawfully imprisoned without judicial process or was "arrested without probable cause." *Snodderly v. R.U.F.F. Drug Enforcement Task* Force, 239 F.3d 892, 900 (7th Cir. 2001); *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). The issuance of an arrest warrant "is an act of legal process that signals the beginning of a prosecution." *Snodderly*, 239 F.3d at 899. In this case, it is undisputed that Flores was arrested pursuant to an arrest warrant issued by KCSAO on February 15, 2007.

Flores argues that the warrant was not facially valid because it was issued in reliance on a deliberately or recklessly false affidavit. Specifically, Flores argues that Galarza withheld material information from the KCSAO that employees of a nearby Walgreens, who also experienced fraudulent credit card use on the same day with the same credit card, could not identify Flores as the suspect. However there is a "presumption of validity" with respect to the affidavit supporting a warrant. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003) (search warrant held valid even with alleged officer omissions and misstatements). To overcome this presumption, plaintiff must provide evidence that "the officers knowingly or intentionally or with a reckless disregard for the truth," made false statements to the judicial officer, which were necessary for that officer to find probable cause to issue a warrant. *Id*. Immaterial misstatements or omissions will

not invalidate an otherwise legitimate warrant. *See id.* In short, the issue is whether a knowingly false statement, or a statement made with reckless disregard for the truth, was necessary for the finding of probable cause in issuing an arrest warrant. *See Franks v. Delaware*, 438 U.S. 154 (1978); *Forman v. Richmond Police Dept.*, 104 F.3d 950, 963-64 (7th Cir. 1997).

Although Flores alleges that Galarza misstated and omitted certain facts to KCSAO, she fails to identify any particular false or misleading statement or omission that the judicial officer relied on to reach the conclusion that the warrant should issue. The omitted facts—that other employees could not identify Flores in a photo-lineup; that Flores paid for subsequent Walgreens purchases with a valid check and driver's license—do not negate Durbin's credible eyewitness account of the fraudulent credit card use on January 12, 2007, along with the corroborating evidence of the markings on the check, which alone were sufficient to find probable cause. *See Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006) (probable cause exists where "a reasonably credible witness" informs an officer that a suspect has committed a crime). Therefore, even though Galarza did not provide all of the information surrounding his investigation to KCSAO, he provided sufficiently credible and accurate information for a judicial determination of probable cause and the subsequent issuance of a valid arrest warrant. Galarza and Kearbey have an absolute defense to Flores' false arrest claims and are entitled to summary judgment. *See Molina*, 325 F.3d at 968.

### ii. Probable Cause

Flores claims that Galarza and Kearbey did not have probable cause to arrest her. The existence of probable cause bars the plaintiff's recovery on a false arrest claim under § 1983. *See Mustafa*, 442 F.3d 544, 547 (probable cause is an "absolute defense" to any claim under § 1983 against police officers for "wrongful arrest, false imprisonment, or malicious prosecution").

Probable cause can even be a defense where the police officers "allegedly acted upon a malicious motive." *Id*. (probable cause would be a defense for officers who allegedly acted with racist motivation). Although probable cause requires more than a bare suspicion of criminal activity, it does not require evidence sufficient to support a conviction. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007). Probable cause exists where "a reasonably credible witness" informs an officer that a suspect has committed a crime. *Mustafa*, 442 F.3d at 548; *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) (complaint of a single witness is generally sufficient to establish probable cause to arrest unless complaint would lead a reasonable officer to be suspicious, in which case he has a further duty to investigate). Probable cause "does not depend on the witness turning out to have been right." *Kelley v. Myler*, 149 F.3d 641 (7th Cir. 1998). Police may arrest "and let prosecutors and the courts determine who is telling the truth." *Askew v. City of Chi*., 440 F.3d 894 (7th Cir. 2006).

In this case, Durbin identified Flores as the customer who fraudulently used Larson's credit card. Durbin told her managers and the police that she saw Flores use Larson's credit card on January 12, 2007. Durbin was the cashier who actively witnessed the fraudulent credit card transaction and communicated directly with the customer. There are no allegations in the record that Durbin lacked credibility or had an existing relationship with Flores. *See id*. (if police know the accuser may harbor a grudge against the accused, follow-up investigation may be required to make an arrest reasonable). Based largely on this information, Galarza, supervised by Kearbey, pursued Flores and contacted KCSAO to seek a warrant pursuant to a credible eyewitness account of fraudulent use of a credit card at the N. Lake street Walgreens on January 12, 2007. *See Mustafa*, 442 F.3d at 548. That Flores was later acquitted of the charges does not negate Galarza's probable

cause for initiating the arrest. *See Kelley*, 149 F.3d at 641. Galarza's failure to disclose other information to KCSAO also does not negate this probable cause. *See Molina*, 325 F.3d at 968. Therefore, Galarza and Kearbey reasonably relied on Durbin's eyewitness account and had probable cause to arrest Flores. For the above reasons, Galarza and Kearbey are entitled to summary judgment on Flores' false arrest claim because they had a valid search warrant and probable cause based on credible eyewitness information.

### iii. Qualified Immunity

Galarza and Kearbey claim in their Motion for Summary Judgment that were a court to find they lacked a valid warrant and probable cause to arrest Flores, they are nonetheless entitled to summary judgment on the basis of qualified immunity. Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about. *Pearson*, 129 S.Ct. at 815 (qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment and liability when they perform their duties reasonably).

Here, Galarza and Kearbey both raised the defenses of qualified immunity in their Answers. Flores argues that qualified immunity is not available to Galarza and Kearbey because their conduct violated her clearly established constitutional rights. Presumably, the right that Flores invokes is the constitutional right to be free from arrest without probable cause. *See Beck v. State of Ohio*, 379 U.S. 89 (1964); *see also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013 (7th Cir. 2006) (arrests made without probable cause do not necessarily deprive the officers of qualified immunity). The relevant question is whether a reasonable officer could have believed that probable cause existed

to make the arrest. *See Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (officers protected by qualified immunity where they possessed trustworthy but ultimately incorrect evidence). Galarza and Kearbey relied upon credible eyewitness statements and established probable cause before pursuing an arrest warrant. *See Mustafa*, 442 F.3d 544. Even if Galarza should not have omitted additional information in his discussions with KCSAO, his omissions do not rise to the level of knowingly violating the law. *See Sornberger*, 434 F.3d at 1013. The failure to obtain the security camera footage from Walgreens was not necessarily Galarza's fault, as he requested the footage and it appears Walgreens had its own technical recording problems and may not have had video footage to provide. Therefore, Galarza and Kearbey are entitled to summary judgment on this count on the basis of qualified immunity because they acted reasonably after establishing probable cause, and they did not violate Flores' constitutional rights.

B. Excessive Force

Flores claims in her Amended Complaint that Galarza and Kearbey used excessive, unreasonable, and unjustified force against her, causing her physical pain and suffering. (Pl. Compl. ¶ 38.) Though false arrest claims and excessive force claims are distinct, Flores pleads them together in Count I. *See Duran v. Sirgedas*, 240 Fed. Appx. 104, 131 n.17 (7th Cir. 2007) (inquiries into false arrest and excessive force are separate and independent though the evidence may overlap). The Fourth Amendment's reasonableness test regarding excessive force is an objective one that considers whether an officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Graham v. Connor*, 490 U.S. 386, 397 (1989). In this case, however, Flores voluntarily turned herself in and has shown no facts that raise any issue of excessive force on the part of any APD Officer, including Galarza and Kearbey. Therefore, Galarza and Kearbey are entitled

15

to summary judgment on Flores' excessive force claim because there are simply no facts regarding physical force used at the time of her arrest.

C. Conspiracy

Flores also alleges a conspiracy claim in Count I, stating that the APD Officers engaged in a joint venture and assisted each other in illegally harassing and arresting her. To establish a conspiracy claim under § 1983, the plaintiff must put forth evidence that the defendants reached an agreement to deprive her of her constitutional rights and that the plaintiff actually suffered a deprivation as a result of the overt acts taken in furtherance of the agreement.[7] *See Scherer v. Balkema*, 840 F.2d 437, 441-42 (7th Cir. 1988). To defeat a defendant's motion for summary judgment on a § 1983 conspiracy claim, the plaintiff must demonstrate the existence of an agreement or acts "sufficient to raise the inference of mutual understanding" between the defendants. *Admunsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000).

Here, the record contains no evidence to suggest that the officers reached an agreement to falsely arrest Flores or use excessive force against her. Moreover, as stated above, Galarza and Kearbey cannot be found to have falsely arrested Flores because they acted pursuant to a valid warrant and with probable cause. In addition, Flores cannot support her allegations of excessive force with any relevant facts in the record. Therefore, there can be no conspiracy to falsely arrest Flores and use excessive force against her because there are no underlying constitutional violations regarding these two claims. *See, e.g.*, *Aponte v. City of Chi.*, 2010 WL 2774095 (2010) (Kendall, J.) (plaintiff cannot sustain § 1983 conspiracy charge where there is no underlying constitutional violation). Even though Galarza and Kearbey do not address Flores' "joint venture" or conspiracy

---

[7] Flores does not allege a conspiracy under § 1985.

charges in their Motion for Summary Judgment, plaintiff's conspiracy claims are unsubstantiated and are effectively rendered moot. As such, Galarza and Kearbey are entitled to summary judgment on Flores' § 1983 conspiracy claim.

## II. Count II

Count II of Flores' Amended Complaint alleges a *Monell* claim against Aurora under § 1983. Aurora cannot be held liable for § 1983 violations under the doctrine of *respondeat superior* "for an injury inflicted solely by its employees or agents." *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). However a plaintiff in a Section 1983 case can sue the individual government actors that allegedly caused the constitutional violation as well as the municipality connected to the violation. *See Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 302-05 (7th Cir. 2010). A municipality may be liable for damages under § 1983 if the unconstitutional act is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *See id.* at 303. A finding of liability against the individual defendants is not a prerequisite for establishing *Monell* liability against the municipality. In other words, a plaintiff can succeed on a *Monell* claim against a municipality despite failing to prove that a specific individual defendant is liable for violating the plaintiff's constitutional rights so long as the two different results are consistent. *See id.* at 305 ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict.") (emphasis in original). To determine whether the City's liability depends on that of an individual defendant, a court looks "to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*

To demonstrate that a municipality is liable under § 1983, the plaintiff must show that the municipality's policy-makers were "deliberately indifferent as to [the] known or obvious consequences." *Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002) (policy-makers must have been aware of the risk created by custom or practice and must have failed to take appropriate steps to protect plaintiff). Where rules or regulations are required to remedy a potentially dangerous practice, a municipality's failure to make a policy is also actionable. *See Thomas*, 604 F.3d at 303. In *Thomas*, the plaintiff presented evidence of County customs and practices that caused a prisoner's death. Plaintiff's evidence included the widespread practice of failing to review inmates' timely filed medical requests, a lack of an internal reporting system, and employee testimony of dangerous practices.

Here, Flores appears to make two *Monell* claims against Aurora: (1) that it was the policy and custom of Aurora to inadequately and improperly supervise and train its police officers (Pl. Compl. ¶ 42) ; and (2) that as a result, Galarza and Kearbey believed their misconduct would not be investigated or sanctioned. (Pl. Compl. ¶ 43.) Galarza and Kearbey mistakenly assert in their Motion for Summary Judgment that, if they are entitled to summary judgment on Count I then they are also entitled to summary judgment on Count II. *See Thomas*, 604 F.3d 293. However, Galarza and Kearbey note that Flores has not deposed any individual policy-makers in Aurora or APD.

Flores claims that Galarza did not receive any specialized training in order to become a detective. This alone fails to allege a constitutional violation and Flores fails to cite to any facts showing that Aurora policy-makers were deliberately indifferent to the known or obvious consequences of a lack of specialized training for new detectives. *See Frake v. City of Chi.*, 210 F.3d 779, 782 (7th Cir. 2000). Flores also cannot allege a constitutional injury because Galarza had

probable cause to arrest her. *See* Section I(A) *supra*. Therefore, Aurora prevails on Flores' first *Monell* claim.

Flores does not provide any evidence to support her second *Monell* claim, that APD officers felt their misconduct would be tolerated. Indeed Flores' own factual assertions demonstrate this to be untrue. Flores cites an interoffice memorandum from Kearbey to Olsen in which Kearbey states "Galarza's work does not meet the standards required of a new detective." (D 56.1 Resp. 25.) Flores also notes that Galarza was reassigned from the detective division to the patrol division by January 2008, within a year of becoming a detective, obviously indicating that his inadequacies were not to be tolerated and were sanctioned. (D 56.1 Resp. 25.) Further, Flores fails to cite to any other violations by APD officers demonstrating her contention that deliberate indifference is a widespread practice within APD. *See Montano v. City of Chi.*, 535 F.3d 558, 570-71 (7th Cir. 2008).

As such, Flores has produced insufficient evidence of any actionable policy on the part of Aurora, or that Aurora was deliberately indifferent to any widespread constitutional violations by its officers, and Aurora is entitled to summary judgment on Flores' *Monell* claim. *See Montano*, 535 F.3d at 571.[8]

## III. Count III

Count III of Flores' Amended Complaint alleges Defendants maliciously prosecuted her. This Court does not recognize malicious prosecution as a constitutional tort where state law provides a remedy for malicious prosecution. *See Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001). Because Illinois provides a state law remedy this Court will address Flores' state law malicious

---

[8] As there is no inconsistency between finding Galarza, Kearbey, and Aurora not liable under § 1983, the *Thomas* analysis does not apply in this case. *See Thomas*, 604 F.3d at 305.

prosecution claims.[9]  *See Adams v. Rotkvich*, 325 Fed. Appx. 450 (7th Cir. 2009) (malicious

prosecution claim not cognizable under § 1983 where Illinois state law provides a remedy).

A. Illinois Malicious Prosecution

i. Pendent Claims

As a general rule, this Court relinquishes jurisdiction over pendent state claims when all

federal claims have been dismissed prior to trial.  *See Williams v. Rodriguez*, 509 F.3d 392, 404 (7th

Cir. 2007).  There are three exceptions to this rule: (1) when refiling of the state claim is barred by

the statute of limitations; (2) where substantial judicial resources have already been expended on the

state claims; and (3) when it is clearly apparent how the state claim is to be decided.  *Id*.

When a district court, in deciding a federal claim, decides "an issue dispositive of a pendent

claim, there is no use leaving the latter to the state court."  *Wright v. Associated Ins. Cos.*, 29 F.3d

1244, 1251 (7th Cir. 1994).  This Court's determination that Defendants had probable cause to

initiate the arrest process, *see* Section I(A) *supra*, is dispositive of this pendent claim because

probable cause is a complete defense to the charge of malicious prosecution.  *See Williams*, 509 F.3d

at 404.  Therefore, it is appropriate for this Court to address Flores' state law claims, because it is

apparent how the state law claim will be decided.

ii. Malicious Prosecution

Illinois does not favor malicious prosecution suits, "due to the public policy interest in the

exposure of crime."  *Ross v. Mauro Chevrolet*, 861 N.E.2d 313 (Ill. App. Ct. 2006).  To establish

a claim for malicious prosecution under Illinois law, a plaintiff must show: (1) the commencement

---

[9] Flores' LR 56.1(b)(2) Memorandum in Opposition to Defendants' Motion for Summary Judgment cites
exclusively to Illinois caselaw in defining and defending her malicious prosecution claim.

of a criminal or civil proceeding against the plaintiff by defendants; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the criminal proceeding; (4) presence of malice on defendants' part; and (5) damages resulting to plaintiff. *Boyd v. City of Chi.*, 880 N.E.2d 1033 (Ill. App. Ct. 2007).

Here, Flores establishes the first, second, and fifth elements. Flores also argues that Galarza's failure to disclose instances of other fraudulent credit card activity at a nearby Walgreens, with the same stolen credit card, establishes Defendants' malice and an absence of probable cause. However, it has already been established that Galarza and Kearbey had probable cause to initiate the arrest procedure, *see* Section I(A) *supra*. Nor is there any evidence in the record that Galarza or Kearbey acted with malice in pursuing the arrest of Flores. *See Turner v. City of Chi.*, 415 N.E.2d 481, 487 (Ill. App. Ct. 1980) (malice not inferred where a review of depositions failed to disclose even a scintilla of evidence that defendant was actuated by improper motives). Moreover, "malice may not be inferred where probable cause exists." *Id*. Therefore, Flores cannot satisfy two necessary elements of her malicious prosecution claim. As such, Galarza and Kearbey are entitled to summary judgment on Flores' state law malicious prosecution claim.

## IV. Count V

Count V of Flores' Amended Complaint alleges false arrest and illegal imprisonment claims against Defendants.[10] In Illinois, to establish a claim of false arrest or false imprisonment, a plaintiff must show that she was restrained or arrested by the defendants and that the defendants acted without having reasonable grounds to believe plaintiff committed an offense. *See Ross*, 861 N.E.2d at 317

---

[10] The federal components of false arrest have already been analyzed in Section I(A) *supra*, therefore only the state law claims will be discussed. *See* pendent claim analysis, Section III(A)(I) *supra*.

("Essentially, a plaintiff has to show that she was unreasonably restrained without probable cause.").

Here, Galarza and Kearbey had probable cause to initiate the arrest process. *See* Section I(A) *supra*. Therefore Defendants are entitled to summary judgment on this Count.

## CONCLUSION AND ORDER

For the reasons stated, Defendants' Motion for Summary Judgment is granted.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 30, 2010